IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| FORREST T. JONES AND COMPANY, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 99-1140-CV-W-HFS |
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY, et al, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**


Before the court is the motion of defendants, the Variable Annuity Life Insurance Company

and the Variable Annuity Marketing Company (collectively "Variable") to set aside the findings of

the examiner, BKD.LLP ("BKD") (doc. 84). Plaintiffs Forrest T. Jones and Company Inc., and

National Pension and Consultant Groups (collectively "FTJ") have filed a motion for leave to file

a first amended complaint (doc. 89), and a motion for partial summary judgment (doc. 92). Variable

then filed a motion for summary judgment (doc. 96); a motion to set aside the order denying its

motion to compel the production of documents(doc. 122); and a motion for leave to file an expert's

report (doc. 128).




**Background Facts**

The following facts are essentially uncontested, but where disputed, will be duly noted. This is an accounting action in which FTJ claims that Variable breached certain provisions of a Selling Agreement pertaining to the payment of fees.

FTJ is involved in insurance administration, and its affiliate, National Pension and Consultant Groups, serves as a broker/dealer. FTJ's primary work is the sale of insurance benefits to educators in the K through 12 educational market. Variable is a provider of annuity markets in the education market, while its subsidiary, Variable Annuity Marketing Company, operates as a broker/dealer for the distribution of securities.

In 1982, the parties entered into a Selling Agreement[1] whereby FTJ agreed to provide customer leads to Variable from its educational base so that Variable could secure tax-deferred 403(b) annuity sales, and Variable agreed to compensate FTJ at a rate of .25% of all premiums received by Variable as a direct result of the FTJ provided leads. The parties engaged in a collective marketing effort by sending mailings to members of particular education-related trade or professional associations whose members may have been eligible to participate in 403(b) programs. Leads generated from FTJ mailings were forwarded to Variable for sales processing. The mailing included a "lead card," with a promise of a free gift if the recipient returned the card. The prospective party would then be contacted by Variable to arrange a visit by a Variable salesperson. If a sale was made based on this combined effort by FTJ and Variable, FTJ was then paid .25% on all premiums paid.

---

[1]According to the parties, the actual signatories to the Selling Agreement were National Pension and Group Consultants, Inc. and the Variable Annuity Marketing Company which was necessary in order to comply with securities regulations concerning the sale of registered products.

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 2 of 28

FTJ states that under this arrangement, it received less than $30,000 annually, and this amount did not increase proportionate to Variable's gains in the market. The last mailing occurred in approximately 1996, and in December of 2001, Variable terminated its Agreement with FTJ to be effective on March 14, 2002. In the interim, on October 28, 1999, FTJ instituted a suit in state court for an accounting. On November 29, 1999, Variable removed the action to this court. After the commencement of litigation, Variable determined and acknowledged that for a 19 month period during 1997 through 1999, FTJ was underpaid by $23,003.

On or about August 26, 2002, the parties entered into a Stipulated Settlement Plan ("SSP") for an accounting to be conducted. The parties selected BKD to be the Examiner. The parties agreed that a deviation between the actual annual payments made and BKD's determinations must be greater than 5% of the actual annual payments to FTJ under the Agreement, or they would be deemed immaterial and non-payable[2]. (SSP: pg. 5). Any deviation greater than the threshold amount would warrant payment for the entire amount of the difference. (Id). According to the SSP, BKD's determination would be final and could only be appealed, subject to an arbitrary and capricious standard, within thirty (30) days of final submission of the final report to the parties; any appeals not filed during this time frame were forever barred. (Id: pg. 4). The parties agreed that the total costs and fees of the accounting effort would not exceed $125,000, and that they would share equally expenses up to $60,000, with the loser paying all amounts above $60,000[3]. (Id: pg. 6). The SSP also

---

[2]For example, if in 1992, the actual amount paid was $25,000, then the threshold for that year is $1,250 ($25,000 x .05). If BKD determined that the finders' fees should have been $26,000, then the deviation for that year would not be considered material, i.e. the deviation would be $1,000, which is less than the $1,250 threshold. (SSP: pg. 5).

[3]If it was determined that Variable owed FTJ a total amount of money for all the years of the accounting in an amount greater than 5% of the money paid, it would be deemed the loser.

3

provided, *inter alia*, that after the accounting was completed the parties could raise legal issues to determine whether any amounts determined to be owed must be paid. (Id: pg. 7-8). The parties agreed that these issues would include, but would not be limited to, statute of limitations, and fees for in force customers at the time the Agreement was terminated; any such issues were to be raised within sixty[4] (60) days from submission of the final report. (Id: pg. 8).

On August 24, 2004, BKD determined that for the period of 1982 through 2004, FTJ had been underpaid $695,761; at that time BKD's fees totaled $94,000. A second round of litigation then commenced.

## Analysis

### Motion to Set Aside the Examiner's Findings

#### Arbitrary and Capricious Standard of Review

In its motion to set aside the findings of BKD, Variable asserts that the findings were arbitrary and capricious. The "arbitrary and capricious" standard examines whether BKD's decision was supported by substantial evidence, meaning more than a scintilla but less than a preponderance. Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 949 (8th Cir. 2000). To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and

---

Similarly, in the event it was determined that such an amount was not owed, FTJ would be considered the loser.

[4]In the SSP, the actual time is miscast as "thirty (60) days," however, the parties agree that the correct time frame to raise legal issues is sixty days.

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 4 of 28

whether there has been a clear error of judgment. <u>South Dakota v. Ubbelohde</u>, 330 F.3d 1014, 1031 (8th Cir. 2003). This inquiry into the facts is to be careful and distinctly more than superficial, yet the ultimate standard of review is a very narrow one, and the court is not empowered to substitute its judgment for that of the decision-maker, in this case the designated Examiner . <u>South Dakota</u>, at 1031.[5] In order for the examiner's decision to pass scrutiny, it must "articulate a rational connection between the facts found and the choice made." <u>Id</u>.; <u>quoting</u>, <u>Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 288 (1974). If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made. <u>Schatz</u>, at 949. In making this assessment, only the evidence that was before the examiner when its determination was made will be considered. <u>Id</u>.[6]

Variable contends that BKD's determination should have been based on the number of mailings, the number of responses received, and the number of responses that resulted in sales ("the conversion rate"). Instead, BKD rejected this actual data, and relied on an assumed conversion rate from a marketing association. Variable claims that this data was based on highly successful direct mail campaigns involving different financial products marketed to different target groups. Thus, BKD relied on incorrect data resulting in an inflated conversion rate. Variable also complains that BKD failed to explain why the conversion rate information provided by the parties was unreliable as compared to the "standard industry conversion rates."

---

[5]The central purpose of the reference is defeated if proceedings degenerate into second-guessing of the initial determination by the agreed expert Examiner.

[6]As noted below, Variable apparently seeks a departure from this standard practice in this case. FTJ also is apparently trying to reopen the proceeding to reach new issues. See Docs. 89, 122, 128.

Variable also complains that although BKD initially found conversion rate information provided by FTJ's expert, David Lee, to be unreliable, BKD subsequently reversed the decision and found the conversion rate information proffered by Mr. Lee for the period of 1986 to the present to be reliable. Variable contends that it was error for BKD to rely on these conversion rates because Mr. Lee based the rates on anonymous sources in the insurance industry and on his undocumented experience.

In what might be construed as its opposition[7], by way of its motion for partial summary judgment FTJ claims that recovery of these fees "is a simple matter of enforcement of the parties' Settlement Plan." This argument is conclusory, and fails to provide sufficiently for a ruling on the merits. Consequently, Variable's motion will be denied temporarily, without prejudice to reconsideration when fully briefed, beginning with directly responsive briefing from FTJ.

<u>Leave To Amend</u>

FTJ seeks leave to amend its complaint in order to update the nature of its claims in light of the parties' agreement noted in the SSP and BKD's findings[8]. Specifically, FTJ seeks to add a claim

---

[7]On August 24, 2004, BKD submitted findings to the parties, and pursuant to the SSP appeals of these findings, subject to a finding of arbitrary or capricious, were to be filed within 30 days of the findings. On September 21, 2004, the parties sought, and were granted an extension until October 24, 2004, to file appeals. (docs. 80 and 82). Nevertheless, on October 25, 2004, Variable filed its appeal (doc. 84), and on November 1, 2004, the parties sought additional time for FTJ to respond. (doc. 87). Again, the request was granted, and FTJ was directed to file its opposition on or before November 23, 2004. (doc. 88). Yet, FTJ chose to seek leave to file an amended complaint (doc. 89), and file a motion for partial summary judgment, primarily for recovery of fees under paragraph 2 of the Agreement. (doc. 92).

[8]In its initial complaint, FTJ sought an accounting of the transactions and methodology used by Variable in determining leads generated by FTJ.

6

for an accounting of what is referred to as paragraph 2 fees. According to FTJ, the Agreement provided that it receive payment from Variable pursuant to a compensation schedule under two separate systems. Paragraph 1 of the schedule related to fees earned from lead card generation, while paragraph 2 pertained to fees earned from Variable's school district penetration. According to FTJ, annuity products subject to the agreement were generally sold to district employees through payroll deduction systems, and Variable received district authorization to conduct payroll deductions attendant to the annuity sales and ongoing premiums. Thus, FTJ contends that the timing of payroll authorizations would largely establish the timing of Variable's school district penetration. FTJ complains that BKD addressed only fees due under paragraph 1, but failed to address those fees due under paragraph 2. FTJ also complains that BKD failed to consider any fees due from in-force customers; these are customers whose premiums were generating fees payable to FTJ at the time Variable terminated the Agreement, i.e. December 21, 2001. FTJ contends that the Agreement required payment to FTJ for fees generated by these in-force customers until full expiration of the account.

FTJ contends that amendment of its complaint is proper because it adds specificity to its claims, incorporates phase two of the accounting process[9], addresses issues specifically reserved by the SSP, and appropriately itemizes its claims between those addressed by BKD and those outstanding. FTJ also contends that the amended complaint relates back to its initial complaint because it arose out of the same conduct, transaction and occurrences.

---

[9]See, Lim v. Chong, 66 S.W.3d 97 (Mo.Ct.App. 2002) (an accounting action is a two stage process: (1) an initial accounting to determine if amounts are due; and if so (2) a subsequent claim for damages pending the results of the accounting).

Variable contends that amendment is untimely. Variable cites various reasons to support this argument, but the most compelling is the fact that in the final report BKD noted that there was insufficient data to assess fees under paragraph 2. Pursuant to the SSP, the parties had 30 days to appeal these findings; yet, FTJ remained silent and did not raise this claim until it filed the instant motion seeking leave to amend on November 18, 2004. This is beyond the expiration date for appeals of the final report dated August 24, 2004.

Even accepting, as FTJ argues, that its argument falls within the parameter of a legal issue thereby providing 60 days to raise, FTJ's argument is not persuasive. There is no dispute that paragraph 2 fees pertained to the premium flow of annuity products from districts which were generally sold to district employees through payroll deduction systems. It is also undisputed that Variable was required to receive district authorization to conduct payroll deductions attendant to annuity sales. As explained by FTJ, reports generated by Variable demonstrated that it penetrated 7,100 school districts between 1984 and 1994, and the timing of its payroll authorizations would largely establish the timing of the school district penetration. FTJ states that it would then be a relatively simple matter of looking at the district participant flow (the employees within that district who buy Variable products), and determining who the first participant was. After determining the answers to a series of questions as to whether the aforementioned employee was from one of the initial associations, or a decision maker, the remaining flow could be earmarked as being subject to paragraph 2 fees.

However, FTJ states that upon BKD's request for these participation agreements, Variable denied possession of these documents. In its sur-reply brief, Variable contends that a Participation Agreement is a three part agreement by which a school district could participate in the same group

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 8 of 28

unit annuity contract that existed between Variable and another trade association such as the American Association of School Administrators and the American Vocational Association. According to Variable, the language in paragraph 2 contemplated that if the efforts of FTJ resulted in the execution of a Participation Agreement with either of these associations, FTJ would receive a commission on the resulting premiums. Variable compared this agreement with a similar agreement entered into by the parties in 1977. However, here, Variable failed to produce any Participation Agreements because none were executed.

FTJ claims that when it learned of Variable's response, it was able to obtain 2 such agreements from local school districts. Yet, as noted by BKD, not only did Variable fail to produce these documents, FTJ also "produced no Participation Agreements." This raises the question as to why FTJ did not produce the agreements in its possession[10]. More importantly, however, upon receipt of BKD's findings relating to these fees, FTJ failed to appeal the decision within the agreed upon time frame. Thus, its attempt to amend its complaint at this juncture is untimely[11]. It is unsound to attempt to use the pleadings, as newly amended, to deal with matters that should have been presented to BKD, or appealed in a timely manner. The basic litigation issues have been resolved long ago, subject only to authorized appeals.

_____

[10]Variable argues that FTJ could have obtained documents from the associations, or could have informed BKD of the existence of these documents and requested that they be obtained.

[11]It is noted, however, that inasmuch as FTJ raises the issue of paragraph 2 fees in subsequent filings, the matter will be considered.

9

<u>FTJ's Motion For Partial Summary Judgment</u>[12]

FTJ seeks partial summary judgment on enforcement of BKD's finding that for the years of 1982 through 2004, Variable underpaid it in the amount of $695,761. FTJ also contends that according to the SSP, as the loser, Variable is responsible for BKD's fees in excess of $30,000. FTJ also seeks fees due from any in-force customers at the time of termination[13].

In support of its motion seeking enforcement of BKD's findings as to paragraph 1 fees, FTJ states that the parties agreed to hire the Examiner to perform an accounting, and that it was calculated pursuant to the parameters set out in the SSP. Thus, it should recover the calculated amount, i.e. $695,761. In a footnote, FTJ asserts entitlement to recovery due to its claim that Variable breached the contract. According to FTJ, the parties entered into a valid contract; it performed under the contract; Variable breached the contract; and it experienced damages as a result of the breach. <u>New York Life Ins. Co. v. Miller</u>, 114 S.W.3d 114, 121 (Tex.App. 2003)[14]. Yet, as noted above, FTJ failed to respond in any significant manner to Variable's position that BKD's decision as to these fees was arbitrary and capricious. Consequently, this part of FTJ's motion for partial summary judgment will be denied without prejudice.

FTJ also points to the SSP in support of its argument that the loser would be required to pay BKD's fees over $60,000. Variable does not dispute this provision, but asserts several arguments why FTJ is barred from recovery; these arguments are repeated in its motion for summary judgment,

---

[12]The parties use the term "summary judgment" inappropriately, as the case has already been "tried". What is involved here is a ruling on appeal, and for supplemental relief.

[13]According to FTJ, liability for in-force fees applies to both paragraph 1 and paragraph 2 fees.

[14]Pursuant to the parties' Agreement, Texas law governs.

10

and will be reviewed in turn. There remains, however, a genuine issue as to whether BKD's finding, favorable to FTJ, was arbitrary and capricious, thereby rendering enforcement inappropriate.

FTJ seeks recovery of fees from in-force customers at the time of termination, and contends that the language of the Agreement as it pertains to termination rights is unambiguous. FTJ notes that paragraphs 5 and 12 of the Agreement permitted either party to cancel the agreement upon 90 day written notice. Exhibit A to the Agreement, however, permitted FTJ to terminate the agreement, with the caveat that "all future compensation provided under the [A]greement shall cease,..." FTJ argues that there was no language providing Variable a similar right, i.e. that payments would cease in the event of a termination of the contract by Variable. According to FTJ, the adopted language was necessary to prevent Variable from developing a significant portfolio through FTJ generated leads, and then cut FTJ out of the deal, and retain the fees. Consequently, FTJ contends it is entitled to recovery of fees from in-force customers at the time Variable terminated the contract.

Conversely, Variable argues against recovery of these fees, and contends that as "sophisticated insurance organizations with substantial years of insurance industry experience," FTJ's reading of the Agreement is incorrect. Instead, Variable points to other provisions of the Agreement that support its position. While Variable agrees that either party had a right to terminate upon 90 days notice, it points to the Compensation provision contained in Exhibit A and contends that payment is due to FTJ only if, *inter alia*, FTJ remains the agent of record. (Agreement; Ex. A: ¶ 4(a)). For instance, paragraph 4 of Exhibit A states that compensation is payable to FTJ "only upon the following conditions." According to Variable, these conditions precedent must be satisfied in order for FTJ to receive payment. These provisions provide that payment is made to FTJ if Variable's products continue to be sponsored by the association as an approved program for its

11

members, and if in Variable's opinion, FTJ is actively promoting interest participation in the annuity contracts. (Agreement; Ex. A: ¶¶ 4(b)( c )). Variable also looks to paragraph 5 which essentially provides that in the event FTJ terminated the Agreement, all future compensation would cease if in its opinion, Variable's products were not competitive, or Variable was not actively soliciting sponsored organization members, or Variable did not provide acceptable administration. Variable argues that when paragraph 4 is read with the provisions of paragraph 5, it becomes clear that FTJ was encouraged to continue to work on Variable's behalf, but if the relationship was terminated, further payments would cease.

Both parties have alerted this court to the Agreement provisions which when read as asserted, arguably support each of their respective conflicting positions. One might suppose that once an application is accepted compensation generated by the course of business under the accepted application would be continuing until that business ceases. The payments are, however, to be made "in accordance with the compensation schedule attached." Agreement, para. 3. There is nothing in the schedule that directly commits Variable to make payments after the termination of the agreement. On the contrary, para. 4 of the Schedule provides that compensation is only payable while the other party (now FTJ) "remains the agent of record to the association or sponsored organization with regard to programs or markets mutually agreed to" and also is "actively promoting interest in participation . . . by members and employees of sponsored organizations." I must conclude that Variable has the better argument in its contention that compensation ceases when the relationship between plaintiff and defendant ceases, and activity supporting payment of premiums ceases.

Whether the arrangement is entirely fair to FTJ is a moot question; I believe it is the sound reading of the Agreement signed by the parties in 1982.

## Variable's Motion For Summary Judgment

In its motion for summary judgment, Variable claims that as a matter of law, FTJ's right to recover is barred by the applicable Texas statute of limitations[15] and the doctrine of laches. Variable also claims that either all or a significant portion of FTJ's recovery is barred due to its failure to satisfy certain conditions precedent. Variable further contends that any claim for recovery of paragraph 2 fees is barred due to FTJ's failure to appeal BKD's finding; and Variable also argues that there is no right to prejudgment interest under Texas law.

## Statute Of Limitations

Variable notes the provision in the Agreement it contends refers to Texas as the choice of law state, and contends that because FTJ's claims are barred under the Texas statute of limitations, pursuant to Missouri's borrowing statute, RSMo. 516.190, the claims are also barred by the laws of Missouri. Variable bases this argument on its contention that the cause of action "originated" in Texas. Alvarado v. H &R Block, 24 S.W.3d 236, 241-42 (Mo.App. 2000) (when the cause of action "originates" in another state, the borrowing statute applies the other state's statute of limitations). In Alvarado, the court held that the cause arises or originates when and where "the final significant

---

[15]Pursuant to the Agreement, the parties agreed that it "shall be construed" in accordance with Texas law. (Agreement: ¶ 13). That is inconclusive, for reasons stated below.

13

event that is essential to the claim occurs;" which Variable claims would be where the alleged underpayment occurred, i.e. Texas[16]. <u>Alvarado</u>, 24 S.W.3d at 242.

Under Texas law, Tx. Civ. Prac. & Rem. § 16.051, and § 16.004 govern accounting actions and a four-year limitations period is applied. A claim may accrue when facts come into existence which authorize the claimant to seek a judicial remedy even though the damages are not ascertainable until a later date. <u>Robinson v. Weaver</u>, 550 S.W.2d 18, 19 (Tex. 1977). Variable contends that FTJ's claim accrued in 1988 when it began expressing concern about underpayment of fees, and its suit filed on October 28, 1999, is therefore, time-barred[17].

In support of its argument, Variable points to the deposition of Richard Copley, the vice president of sales promotions with Variable, who testified that in 1988, he was assigned to set up a system to track the leads. (Supporting Suggestions: Ex. F, pg. 39). However, when questioned as to whether FTJ had expressed concern about being properly paid, Mr. Copley expressed his sense of a concern (on the part of FTJ) that a good system was in play. (Id: pg. 40). When asked if he ever heard anyone say that FTJ complained of being underpaid or wanted to know what was going on or

---

[16]Variable cites <u>State ex rel Reedcraft Manufacturing, Inc. v. Kays</u>, 967 S.W.2d 703, 705 (Mo.App. 1998), for the proposition that under Missouri law an action for non-payment of money owed under a contract would accrue where payment was to take place if the location was expressly set forth in the contract. Variable then argues that since here, the Agreement is silent about such a location, the action is deemed to accrue at the office where the decision to withhold payment was made. <u>Reedcraft</u>, at 705. According to Variable, the decision resulting in an alleged underpayment would have been made at its Houston office in Texas.

[17]Variable concedes that even, *assuming arguendo*, that Missouri's statute of limitations were applied, the result would be the same. For, under RSMo. § 516.110, accounting actions to enforce a contract are governed under a 10 year period, and the claim is deemed to accrue when the damage is sustained and capable of ascertainment. RSMo. 516.100.
The "discovery rule" in Texas is comparable to the qualifier. See, e.g., <u>Willis v. Maverick</u>, 760 S.W.2d 642 (Tex. 1989); <u>Colonial Penn Ins. v. Market Planners Ins. Agency Inc.</u>, 157 F.3d 1032 (5th Cir. 1998).

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 14 of 28

anything like that, Mr. Copley testified that he heard that and it prompted a letter. (Id: pg. 135). Variable also points to a letter dated August 12, 1988, written by Mr. Copley to Gale Bartow, vice president of FTJ, which included procedures for the finders fee system pursuant to a prior request by FTJ. (Id: Ex. F). Variable also notes the deposition of JoAnne Gassman, an employee of FTJ, who testified that she suspected that FTJ was not receiving all of the monies it was entitled to under the Agreement, and that she indicated that suspicion to Susan Cornwell. (Id: Ex. C, pg. 76-77). However, she could not recall the time frame in which she harbored such suspicions. (Id: pg. 77).

Variable argues that in the event FTJ's entire claim is not time barred, then the limitations period would still bar a portion of the recovery. Under this proposition Variable claims that where, as here, the damage claimed is not the result of one single event, but an alleged series of wrongs, the statute of limitations limits the damages looking back from the date suit is filed. Jackson v. Creditwatch, Inc., 84 S.W.3d 397, 405 (Tx.Ct.App. 2002), *overruled on other grounds by*, Creditwatch, Inc. v. Jackson, 157 S.W.3d 814 (Tex.Sup.Ct. 2005)[18].

Conversely, FTJ argues that questions regarding the applicable statute of limitations are procedural questions governed by the state law where the action is brought. Consol. Fin. Invests., Inc. v. Manion, 948 S.W.2d 222, 224 (Mo.Ct.App. 1997). Consequently, the choice of law provision in the Agreement is not determinative because it only applies to issues of substantive law. Consol., at 224. Further, as asserted in its Petition, the cause of action accrued in Kansas City, and Variable

---

[18]Variable states that again, the result would be the same under Missouri law. Balke v. Central Missouri Electric Cooperative, 966 S.W.2d 15, 20 (Mo.App. 1997) (where there is a continuing wrong, the statute of limitations does not work as a complete time-bar of a claim, but only works to bar those damages which accrued prior to the statutory period in question immediately preceding suit). Thus, Variable contends that FTJ could not recover damages for any period prior to October 28, 1989.

15

failed to deny this allegation in its answer. <u>Hemar Insur. Corp. of America v. Ryerson</u>, 108 S.W.3d 90, 95 (Mo.Ct.App. 2003). Additionally, FTJ claims that pursuant to the Agreement, payments were to be sent to FTJ in Missouri, and every payment was received in Missouri. More importantly, FTJ contends that under R.S.Mo. § 516.100, the cause of action is deemed to accrue when the resulting damage is sustained and capable of ascertainment, and if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained. <u>Sabine v. Leonard</u>, 322 S.W.2d 831, 837 (Mo.banc 1959).

Contrary to Variable's contention, FTJ argues that it first inquired about underpayments by letter dated September 13, 1996, in which it reiterated a recent agreement with Joe Osborne, senior vice president of Variable, that a review of the commissions paid over the last several years would be appropriate. (Suggestions in Opposition: Ex. 21). According to FTJ, the Copley testimony cited by Variable merely demonstrated its concern that a system be in place, and evidenced the need for diligent monitoring, as opposed to a belief by FTJ of a breach. Finally, FTJ argues that Variable's recollection of Ms. Gassman's testimony is exaggerated.

After reviewing the arguments set forth by the parties, I find that Missouri law should be applied regarding the statute of limitations question, and that the 10 year limitations period clearly applies under these circumstances. As in <u>Consol. Fin. Invests.</u>, supra, the Agreement does not direct us to foreign law because it simply indicates how it should be interpreted. It is less favorable to Variable's contention because, unlike the cited case, there is no language indicating it should be "governed" by foreign law. Further, the forum state would, as in the cited case, treat a limitations issue as procedural in nature. The effect of Missouri's borrowing statute is, however, pertinent. The late Judge Koger dealt with a comparable issue in <u>In re Master Mortgage Investment Fund, Inc.</u>, 151

16

B.R. 513 (Bkrtcy.W.D.Mo. 1993). After a careful review of pertinent law, he held that a violation of a promise to pay would be treated by the Missouri courts as accruing (being sustained) at the creditor's place of business. More recently, the Circuit cited the Koger ruling in a tort case, reaffirming the view that injury was sustained where it affected the victim. Rajala v. Donnelly Meiners Jordan Kline, P.C., 193 F.3d 925, 928 (8th Cir. 1999).

Cases relied on by Variable are not controlling, under the facts or the law. They do not deal with the statute in question here, but concern venue and other issues which do not necessarily shake out in the same manner. Variable argues that there must be "express" language designating a place of payment before that place becomes the place where a claim for nonpayment accrues. I do not read the cases in that manner, and there is no reason why some magic language is controlling. The contract in question does indicate how a place for notification can be determined, and presumably that would also be the place of payment, and the place where a claim accrues. Therefore, I conclude that Missouri law applies, and we begin with a ten year statute of limitations.[19]

If pertinent to this decision, I also agree with FTJ that the deposition testimony cited by Variable essentially indicates FTJ's desire to have an accurate and efficient system in place to monitor the lead cards, and therefore, ensure accurate and timely commission payments. Furthermore, Ms. Gassman's testimony fails to strengthen Variable's argument that since 1988, FTJ was suspicious and/or concerned that it was not receiving the correct amount of fees. For although she expressed such suspicious, she could not recall the time frame. Variable also points to letters

---

[19]It is probably arguable that the four year Texas statute may be even more favorable to FTJ, under tolling concepts. An accounting procedure is, almost by definition, one in which a claimant does not have access to information permitting it to formulate a claim in a definite amount, or even to know whether money is definitely due. If tolling applies, absent a good laches defense, Variable would be liable for the full amount of underpayment.

17

written by Dick Jones in which he complained of the commission payments. (Supporting Suggestions: Ex. J and Ex. K). However, these letters were written on September 13, 1996, and January 8, 1997, well within the limitations period[20]. I find that FTJ's claims are not time barred.

In the alternative Variable claims that under Missouri's 10 year limitations period, FTJ could recover damages going back to October 28, 1989, and cites for support Davis v. Laclede Gas Company, 603 S.W.2d 554, 556 (Mo.banc 1980). FTJ counters that § 516.100 provides that the cause of action in a continuing damage claim accrues when the last item is capable of ascertainment, here, 1996, and FTJ relies on Sabine v. Leonard, 322 S.W.2d 831 (Mo.banc 1959) to support its claim that recovery would include all damages, not just those which occurred during the 10 year period. The court in Sabine expressly states that where there is more than one item of damage (installment), the cause of action shall not be deemed to accrue until the last item of damage is sustained i.e. the last installment becomes due, so that "all damages" may be recovered. Sabine, at 838. However, the Davis case is more recent in time, and although it did not overrule Sabine, I find it to be the controlling law in Missouri, regardless of how the statutes might otherwise be construed. The Davis decision saves the timeliness of this case, but in rejecting damages earlier than the applicable five-year period it arguably limits recovery here to that occurring within the statutory ten-year limitation.

For the same reason that I suggested that the Texas statute, if applicable, might be avoided as a bar if tolling occurs, Variable faces a serious problem under Davis because it must satisfactorily

_____

[20]Variable also points to a letter written by Mr. Condon on March 30, 1998, in which he states that " for some years now, "FTJ has felt uneasy about the level of remuneration. (Supporting Suggestions: Ex. M). However, again, without more, this fails to indicate the time frame to which Mr. Conlon refers.

establish that the recovery sought here was capable of ascertainment much earlier. I dealt with comparable issues last year in Creative Marketing Associates, Inc. v. AT & T Corporation, 2005 WL 2250831 (W.D.Mo. 2005). A case cited there, Reed v. Reed, 817 S.W.2d 503 (Mo.App. 1991), preserved for decades a claim under an antenuptial agreement. Where a special relationship exists between a claimant and an alleged debtor, or where the debtor is in possession of controlling information, the Missouri courts often treat old claims as not reasonably capable of ascertainment. Deutsch v. Wolff, 994 S.W.2d 561, 572 (Mo. banc 1999) (accountant); St. Louis Associates v. Gannon Management, 948 S.W.2d 225 (Mo.App. 1997) (property management company). Federal law also uses tolling, in comparable situations. Phillips Petroleum Co. v. Lujan, 4 F.3d 858 (10th Cir. 1993) (royalty obligations). Of the cases cited, the Phillips Petroleum case may be the closest, in the relationship between the parties. The 10th Circuit ruling limiting the claim to six years, because document retention was required for that period, for use in making an audit, is, however, limited to special circumstances pertinent to the Government's implied obligation not to neglect an audit interminably. Our case may be closer in concept to what the Missouri Supreme Court said in Deutsch, supra, "(a) general feeling of suspicion" does not "amount to knowledge" when dealing with a party having fiduciary obligations or financial management responsibilities. 994 S.W.2d at 572. I conclude that even the generous ten-year statute of limitations does not serve as a complete bar to recovery of moneys due under the accounting. Thus, FTJ is entitled to seek recovery of damages, if any, for the period before October 28, 1989.

19

Laches

Next, Variable contends that even if FTJ's claim is not barred by the limitations period, it is barred by laches. In reliance on Texas law, Variable claims that although FTJ expressed concerns about the payments in 1988, it failed to commence an accounting action until 1999. Variable claims that this lapse in time resulted in grave injustice to it as the defending party.

Laches is the "neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done." Elton v. Davis, 123 S.W.3d 205, 211 (Mo.App.W.D. 2003). Mere delay does not of itself constitute laches; instead, the delay involved must work to the disadvantage and prejudice of the defendant. Elton, at 211. Although laches is a question of fact to be determined from all the circumstances, generally the trial court must determine whether the harm to the defendant in allowing the suit to proceed outweighs the harm to the plaintiff in failing to consider her claims. Id.

Here, Variable simply claims that it was caused undue prejudice due to the time which lapsed before FTJ filed suit; however, Variable fails to refer to any specific prejudice incurred[21]. Variable's conclusory claim that BKD had to rely on assumptions because other documents no longer existed is insufficient to support the laches claim. As noted by FTJ, several knowledgeable employees of Variable were able to shed light on the claims alleged through deposition testimony. (Statement of Facts: 91-95).

---

[21]Variable complains that it is hampered in its defense because FTJ expressed concern about payments in 1988, yet, it failed to commence suit until 1999. While there was a significant time lapse, as previously noted, FTJ did not express concern about potential underpayments until 1996.

The laches claim here is really a complaint that Variable faces an excessively long statute of limitations, particularly because of the requirement that loss be ascertainable. That is a legislative issue.

Conditions Precedent

A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. Associated Indemnity Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 283 (Tex. 1998). Conditions precedent are acts or events that occur subsequent to the formation of a contract and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty. McMahon v. Greenwood, 108 S.W.3d 467, 484 Tex.App. 2003); see also, Cal-Tex Lumber Company, Inc. v. Owens Handle Company, Inc., 989 S.W.2d 802, 809 (Tex.App. 1999).

If a contract contains conditions precedent, under Texas procedural law there must be some allegation by the plaintiff that the conditions have been met. Grimm v. Grimm, 864 S.W.2d 160, 161 (Tex.App. 1993). Under Tex.R.Civ.P. 54, if a plaintiff pleads generally the performance or occurrence of conditions precedent, the plaintiff need only prove performance of those conditions specifically denied by the defendant. Grimm, at 162.

Normally, in order to create a condition precedent, an agreement must use a term such as "on condition that," "if," "provided that," or some similar conditional phrase. McMahon, 108 S.W.3d at 484. While there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed. Cal-Tex, 989 S.W.2d at 809. Because of the harshness in operation, conditions precedent are not favored in law, and courts

will not construe a contract provision as a condition precedent unless they are compelled to do so by language that may be construed in no other way. Id.

Variable claims that FTJ is not entitled to recovery because it failed to plead satisfaction of the conditions precedent[22], and, indeed, failed to satisfy those conditions precedent contained in the Agreement. Variable also contends that it did not waive FTJ's compliance with the conditions precedent, and, in fact, noted its concern, both in a phone call and a letter, dated April 6, 1998, and April 8, 1998, respectively. (Supporting Suggestions: Exs. N and O).

FTJ counters that inasmuch as Variable continued to pay commissions, it has waived any right to now argue non-compliance of conditions precedent. Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming a right. Bekins Moving & Storage Co. v. Williams, 947 S.W.2d 568, 576 (Tex.App. 1997); see also, Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640 (Tex.App. 1996).

In its suggestions in support of summary judgment, Variable claims that it has always maintained that the conditions precedent remain in effect; purportedly illustrated in its communications with FTJ in 1998. In its reply brief, Variable contends that it presumed FTJ was meeting its obligations to maintain endorsements, remain agent of record, and actively promote interest in Variable's products. Both of these arguments miss the point. For notwithstanding Variable's position that it did not either expressly or impliedly waive compliance, the

_____

[22]FTJ admits that it failed to plead satisfaction of conditions precedent, but sought to include it in an amended complaint. As noted above, leave to file an amended complaint was denied. However, the failure to plead satisfaction is not fatal, for FTJ may nevertheless obtain judgment on its cause of action if it meets its burden of proving all essential elements of the cause, including the performance of any conditions precedent. Grimm v. Grimm, 864 S.W.2d at 162.

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 22 of 28

communications on which it relies in support of this argument quite clearly demonstrate that while cognizant that FTJ was not in compliance, Variable continued paying commissions. For instance, in the memo dated April 6, 1998, in which Mr. Condon of FTJ memorialized his conversation with Mr. Osborne of Variable, he notes Variable's opinion that it has treated FTJ "more than fairly" considering FTJ is "not agent of record any longer, not active in marketing, and not active in support." (Supporting Suggestions: Ex. N). In a letter dated April 8, 1998, Mr. Osborne stated that even though the Agreement called for FTJ to be paid commissions based on sales derived from lead cards received due to the promotional efforts of FTJ, Variable had been giving FTJ credit for these sales "without regard to determining whether the sale truly resulted from the lead card ..." (Supporting Suggestions: Ex. O, pg. 1). Mr. Osborne continues by expressing concern as to whether FTJ has been actively promoting interest in participation by members of sponsored organizations as required by the Agreement, and acknowledges that FTJ is no longer agent of record for the organization AASA; but Mr. Osborne did not insist on compliance. (Id: pg. 2). The evidence shows that Variable continued to pay commissions to FTJ, notwithstanding its allegations of non-compliance; thus, Variable has waived or relinquished any right it may have had to demand satisfaction of conditions precedent.[23]


Motion To Set Aside Denial of Motion for Production of Documents

Variable claims that BKD's finding of underpayment was made predominately on the basis of assumed conversion rates, i.e. the number of leads converted to sales. According to Variable, this

_____

[23]The waiver would not be irrevocable, however, and would not survive termination of the Agreement.

finding was the result of factual information obtained from the Direct Marketing Association ("DMA"), i.e. case studies, articles, and a purported "national survey." Variable claims it needs these documents to refute BKD's findings.

It is noted that after submission of its report on August 4, 2004, at the behest of the parties, (Motion to Compel: Exs. G and H), on September 22, 2004, BKD answered further inquiries. (Id: Ex. I). On December 21, 2004, Jim Snyder[24], on behalf of BKD, appeared for deposition testimony. (Id: Ex. P). Following the deposition of Mr. Snyder, and still dissatisfied, Variable continued to seek documents by serving a subpoena upon BKD. On February 24, 2005, a conference call was held with the parties by Magistrate John T. Maughmer in his role as Special Master[25]. By an order dated May 5, 2005, Magistrate Maughmer denied Variable's motion for the production of documents, and quashed the subpoena duces tecum served on BKD. (doc. 121). Essentially, Magistrate Maughmer noted that the parties agreed that BKD should serve as an independent fact finder in their quest to resolve the case. (5/5/05 Order: pg. 2). Further noted, was the parties agreement to be bound by the findings of BKD, subject only to an appeal based on an arbitrary and capricious standard. (Id: pg. 3). To the extent that an appeal of BKD's findings would be appropriate, Magistrate Maughmer concluded that the appeal should be limited to the record as it existed at the time of the appeal. (Id:

---

[24]Subsequently, by letter dated March 18, 2005, Mr. Snyder advised Magistrate Maughmer of his prior explanation to the parties that he utilized a 25-step process in reaching his conclusions, and while he also utilized data from the DMA, he ultimately used a lower conversion rate than suggested by the DMA, which resulted in a significantly lower underpayment cost to Variable.

[25]By order dated April 1, 2003, Magistrate Maughmer agreed to serve as Special Master pursuant to the SSP. (doc. 76). Specifically, the SSP provided that the Special Master oversee the accounting process and address any issues that arose through the performance of the accounting. (SSP: pg. 1).

pg. 4). As such, Magistrate Maughmer held that since an appeal on that basis, filed by Variable, was pending, discovery during the pendency of the appeal was neither warranted nor justified. (Id).

In seeking an order from this court to set aside Magistrate Maughmer's decision, Variable argues that it does not seek to create a record subsequent to its appeal of BKD's findings, but, rather, it seeks to have the factual record as it existed at the time BKD rendered its findings. FTJ opposes the instant motion and contends that the production of BKD's files opens the door to inappropriate continued discovery. FTJ asserts that the current record presented by BKD is more than adequate. According to FTJ, BKD engaged in a twenty-five step examination process, and by seeking DMA files, Variable excludes the balance of BKD's work from review. FTJ contends therefore, that in the event any portion of BKD's work is reviewed, it too should be afforded an opportunity, by means of additional discovery, to review the other twenty-four steps.

Similar to the findings of Magistrate Maughmer, FTJ argues that the parties agreed to retain an independent examiner (BKD), who would be charged with performing an accounting, and that an appeal, if any, would be subject to an arbitrary and capricious standard. Contrary to the relief sought be Variable, the SSP did not grant the parties a right to engage in further discovery by reviewing BKD's findings. In sum, BKD was required to perform the accounting, provide a report setting forth its findings; BKD has performed as agreed, and has provided written answers to follow up questions by the parties, as well as deposition testimony detailing its methodology.

After consideration of the respective positions set forth by the parties, I find the findings of Magistrate Maughmer, and the arguments submitted by FTJ to be persuasive. Thus, Variable's motion to set aside Magistrate Maughmer's decision will be denied.

Case 4:99-cv-01140-HFS   Document 133   Filed 08/01/06   Page 25 of 28

Motion to File Expert Report

Variable seeks to include the report of its expert, Donald R. Jackson, as supplemental authority in support of its motion to set aside the findings of BKD. Variable contests that part of BKD's finding as it relates to assumptions about conversion rates. To that end, Variable contends that Mr. Jackson's report provides factual detail about the materials obtained by BKD from DMA, and Mr. Jackson's opinion that there was no rational connection between those materials and the conversion rate assumptions made by BKD. Variable acknowledges that review of an administrators' finding under an arbitrary and capricious standard requires review of only the factual items before the administrator. Yet, Variable attempts to show that the material to be included is the same as the factual record considered by BKD, and, therefore, should be accepted. In support of this argument Variable relies on Phillips-Foster v. UNUM Life Ins. Co. of America, 302 F.3d 785, 798 n. 11 (8th Cir. 2002). Variable's reliance is misplaced, for in Phillips-Foster, inclusion was sought for documents which clearly should have been in the record before the administrator. Here, Variable argues that its expert's report should be included in review of its challenge to BKD's findings, while on the other hand, it asserts that the report provides the factual record considered by BKD[26].

FTJ repeats its opposition claiming that inclusion of this report would necessitate additional expense, time, and delay since it would be required to depose Mr. Jackson. FTJ also complains that the provisions agreed to by the parties and memorialized in the SSP did not contemplate the use of additional experts.

---

[26]It is noted that although Variable sought to compel BKD to turn over documents used in formulating its findings (docs. 119 and 122), Variable now states that its expert, Mr. Jackson, was able to retrace BKD's footprints and locate all the material obtained by BKD. (Supporting Suggestions: pg. 4).

26

Nevertheless, as noted above, Variable filed a timely motion appealing BKD's findings under an arbitrary and capricious standard. FTJ failed to respond, and that appeal is still pending. Consequently, the record remains open so that FTJ may respond, both to the motion and Mr. Jackson's report. Variable will then be given an opportunity to file a reply brief.

Accordingly, it is hereby

ORDERED that Variable's motion to set aside the findings of the examiner (ECF doc. 84) is DENIED without prejudice. FTJ is directed to file a response to the motion within twenty (20) days from the date of this order. Variable is directed to file a reply brief within twelve (12) days thereafter. It is further

ORDERED that FTJ's motion for leave to file an amended complaint (ECF doc. 89) is DENIED. It is further

ORDERED that FTJ's motion for partial summary judgment (ECF doc. 92) is GRANTED in part, and DENIED in part, consistent with this opinion. It is further

ORDERED that Variable's motion for summary judgment (ECF doc. 96) is DENIED. It is further

ORDERED that Variable's motion to set aside the order denying motion to compel the production of documents (ECF doc. 122) is DENIED. It is further

ORDERED that Variable's motion for leave to file expert's report (ECF doc. 128) is

GRANTED, as a supplement to the record.  Whether it may be considered in support of the claim

of arbitrariness will be decided after briefing is complete. The report as attached to the motion as

Exhibit A will be deemed filed.


/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

August 1, 2006

Kansas City, Missouri